## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JEFFREY A. COCHRAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE PENN MUTUAL LIFE INSURANCE COMPANY and HORNOR, TOWNSEND & KENT, LLC,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

By and through his undersigned counsel, Plaintiff Jeffrey A. Cochran ("Plaintiff"), alleges the following against The Penn Mutual Life Insurance Company ("Penn Mutual") and Hornor, Townsend & Kent ("HTK") (collectively, "Defendants").  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Defendants and other related parties and non-parties with the Financial Industry Regulatory Authority ("FINRA"), the U.S. Securities and Exchange Commission ("SEC") and other regulatory

authorities; (b) review and analysis of press releases, marketing materials, and other publications disseminated by Defendants and other related parties and non-parties; and (c) review of news articles and investor communications.  Plaintiff believes that further substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery, especially in view of the fact that much of the evidence supporting the allegations contained in this complaint is within the exclusive control of Defendants.

## NATURE OF THE ACTION

1.     This is a class action seeking to challenge Defendants' practice of recommending that customers' tax-qualified accounts, such as IRAs, be used to fund variable annuity contracts.

2.     Under the Internal Revenue Code, insurance products are exempt from income taxation on their inside investment build-up (earnings).  The main economic value of investing through a deferred annuity is to qualify for these tax advantages, including tax deferral of earnings and the ability to switch among different investment accounts inside the annuity without triggering current taxation.  However, for persons funding retirement plans (traditional IRAs, rollover IRAs, Roth IRAs, 401(k) plans, and 403(b) arrangements, for example), these tax advantages are unnecessary and redundant.  Under the Internal Revenue Code, such

retirement plans are already automatically tax deferred (also referred to as "tax-qualified") regardless of the investments placed in the plan. Defendants nevertheless target sales of variable annuities[1] to persons seeking to fund tax-qualified retirement plans.

3.     At least one previous case has successfully challenged this same essential practice. *See generally Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) (Alaimo, J.) (certifying a nationwide class of variable annuity purchasers asserting violations of § 10(b) of the Securities Exchange Act of 1934 and other federal securities statutes).[2]  But where the *Cooper* case focused on disclosure failures, this case takes a different approach. Plaintiff does not challenge the disclosures at issue here but rather seeks to test whether this conduct is a breach

---

[1]     A variable annuity is a hybrid insurance and investment product. The securities component consists of units of interest in a separate account that are registered as securities under the Securities Act of 1933. The separate account is registered as an investment company in compliance with the Investment Company Act of 1940 ("ICA"). The insurance components of variable annuities consist of an annuity insurance contract issued by a state-regulated insurance company, and interests in one or more fixed accounts that invest in the general account of a state-regulated insurance company. As a writer of insurance, an insurance company issuing variable annuities typically claims the "insurance company" exemption from ICA regulation provided at Section 3(c)(3) in the ICA. In so doing, the insurance company avoids having to comply with the numerous important investor protections of the ICA in the sale of variable annuities.

[2]     A copy of the complaint from the *Cooper* action is included herewith for background purposes.

of the fiduciary duties that brokerage firms owe to their customers under Georgia law.

4.      The applicable standard was articulated by a unanimous Georgia Supreme Court in *Holmes v. Grubman*, 286 Ga. 636, 643 (2010). There, in response to a certified question from the Second Circuit of whether "a brokerage firm owe[s] a fiduciary duty to the holder of a non-discretionary account" under Georgia law, the Justices answered in the affirmative, concluding that "[t]he broker will generally have a heightened duty, even to the holder of a non-discretionary account, <u>when recommending an investment</u> which the holder has previously rejected or <u>as to which the broker has a conflict of interest</u>." 286 Ga. at 643 (emphasis added).

5.      Plaintiff's position is that recommending that tax-qualified funds be used to purchase a variable annuity constitutes just such a conflict of interest and cannot pass muster when held up to a fiduciary standard. Simply stated, a fiduciary has a duty to put the interests of someone else ahead of his own. And that is not happening here. The insurance and surrender fees charged to annuity owners (which are in addition to investment management fees, contract administration fees and add-on rider fees) yield much greater income to Defendants than would be realized from the sale of straight mutual funds providing the same investment options. This greater income provides additional profits to Defendants and additional compensation to the

selling agents, who receive higher commissions on variable annuity sales than they would on sales of mutual funds.

6.    Brokerage firms love to sell variable annuities because of these relatively high fees and the large commissions that come with them.  But the high fees associated with variable annuities can only be justified from the customer's standpoint by their tax-deferred growth, a benefit that is useless in an IRA like Plaintiff's, which consisted entirely of already tax-qualified funds.  As the SEC puts it in their investor protection materials, "In general, the benefits of tax deferral may outweigh the costs of a variable annuity only if you hold it as a long-term investment. . . . If you are investing in a variable annuity through a tax-advantaged retirement plan, you will get <u>no additional tax advantage</u> from the variable annuity.[3]

7.    Mr. Cochran was advised to put his retirement funds in a variable annuity, and because he followed that advice, his fiduciary has raked significant unnecessary fees throughout the nearly six-year period since he opened his account: Mortality and Expense ("M/E") charges of 1.45%; Administrative charges of 0.15%; Rider charges of 1.05%; and excessive underlying subaccount expenses ranging from 0.95% to 1.80%.  All of this before the prospect of an additional surrender

---

[3]      *See* https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/updated-investor-bulletin-variable-annuities#What_Is (emphasis in original).

charge is factored in.  As a result, huge amounts of money that should have been deployed for Mr. Cochran's benefit have instead been siphoned off – by his fiduciary – in the form of inappropriate fees.

8.     And it matters, because these fees make a huge difference in investment returns over the course of many years of saving and investing for retirement.  By retirement age, insurance fees and other detriments of variable annuities cause the loss of a tremendous percentage of a retirement investor's account value, as compared to straight investment products such as mutual funds.

9.     Mr. Cochran's experience (in just the last six years) is a testament to that fact. The many layers of fees make a direct comparison a bit cumbersome, but by way of illustration, had Mr. Cochran's retirement funds been invested in equities (as they were in the 401(k) from which these funds were taken) such as a low-cost S&P 500 ETF on February 4, 2013, the initial investment of $365,274.83 would be worth $712,435.99 as of the end of September, 2018 (the date of the most recent available annuity statement), for a gain of $347,161.16, or 95%.  By contrast, because these potential investment gains have instead been absorbed in the form of high and unnecessary fees, Mr. Cochran's most recent statement shows that his annuity was worth $498,313.63 if you include the surrender charge, for a gain of $133,038.80, or 36.4%.  This is an admittedly back-of-the-envelope calculation, but

6

it is included here to show the amounts in controversy and the magnitude of the harm.

10.    Plaintiff brings this action to recover damages in an amount to be determined at trial on behalf of the following Class: all Georgia residents who purchased an individual variable deferred annuity contract or who received a certificate to a group variable deferred annuity contract issued by The Penn Mutual Life Insurance Company, or who made an additional investment through such a contract, within the applicable statute of limitations (the "Class Period") that was used to fund a contributory retirement plan or arrangement qualified for favorable tax treatment pursuant to sections 401, 403, 408, 408A, or 457 of the Internal Revenue Code.  Excluded from the Class are Defendants, any officer or director of Defendants or entity in which Defendants had a controlling interest during the Class Period, any member of those persons' immediate families, and the legal affiliates, heirs, controlling persons, agents, successors and predecessors in interest or assigns of any such excluded person or entity.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over this Class action pursuant to 28 U.S.C. § 1332(d)(2).  The claims of the Class members are in excess of $5,000,000 in aggregate, exclusive of interest and costs, and at least one member of

the Class is a citizen of a state different from the Defendants.  In addition, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  The amount in controversy exceeds $75,000, exclusive of interest and costs, and the Plaintiff is a citizen of a state different from the Defendants.

12.     This Court has jurisdiction over the Defendants because they transact business in this state, have purposely availed themselves of the laws of this state, and because a substantial part of the events giving rise to Plaintiff's causes of action occurred in this state.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendants maintain offices throughout the state of Georgia, Penn Mutual's registered agent is located in Gwinnett County in this district, and a substantial part of the events giving rise to Plaintiff's causes of action occurred in this district.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails and interstate telephone communications.

## PARTIES

15.     Plaintiff Jeffrey A. Cochran is and was at all pertinent times a Georgia resident.  He was sold a Penn Mutual deferred variable annuity during the Class

Period on February 4, 2013 and suffered damages as a result. Mr. Cochran was formerly employed by J.A. Thomas & Associates, Inc. and had a 401(k) account there until the company was acquired and the plan terminated. Thereafter, he rolled those 401(k) funds into a rollover IRA, which is also tax-qualified. Mr. Cochran was introduced to Llewellyn Rowell, who was a registered representative employed by HTK in Marietta, Georgia. Mr. Rowell convinced Mr. Cochran (and a number of his co-workers at J.A. Thomas who were in the same situation) to invest those tax-qualified IRA funds in a Penn Mutual deferred variable annuity. Mr. Cochran's variable annuity contract is still subject to a surrender penalty, which has impeded his ability to exit this product.

16.     Defendant Penn Mutual is an insurance company organized as a for-profit Pennsylvania corporation with its principal office located at 600 Dresher Road, Horsham, Pennsylvania 19044. Penn Mutual maintains its Georgia registered agent in Gwinnett County.

17.     Defendant HTK is a brokerage firm and investment adviser firm organized as a for-profit Pennsylvania limited liability company with its principal office also located at 600 Dresher Road, Horsham, Pennsylvania 19044. The LLC has only one member, and that is Penn Mutual, so HTK is Penn Mutual's wholly-owned subsidiary.

9

18.     Defendant HTK was at all times relevant hereto the employer of Mr. Rowell and many other individual brokers.

19.     Mr. Rowell and the other brokers were acting within the scope of their employment when they took the actions described herein.

20.     The acts of Mr. Rowell and of each employee, agent, and representative of Defendants are imputed to and binding upon Defendants under the doctrine of *respondeat superior*, principles of agency law, licensing, controlling person and/or as otherwise allowed by law.

## ADDITIONAL ALLEGATIONS

21.     At all times relevant hereto, HTK was and is in the business of offering investment advice in exchange for fees. Plaintiff and the Class members entered into a relationship with HTK whereby HTK would advise and assist Plaintiff in making appropriate investments, and Plaintiff would pay a fee for such advice and assistance. Plaintiff and the Class members carried out their end of that arrangement, but HTK did not. Instead of recommending appropriate investments for Plaintiff's IRA, HTK steered that money to variable annuities that would generate larger fees for HTK.

22.     A special relationship of trust and confidence exists between a securities seller and customer. As noted above, Georgia courts have expressly

characterized that relationship as fiduciary in nature, and so has the Eleventh Circuit Court of Appeals. *See, e.g.*, *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor."). *See also* Loss, Securities Regulation 1508 (2nd Ed. 1961) ("There is in effect and in law a fiduciary relationship"); 5C Jacobs, Litigation and Practice Under Rule 10b-5 §210.03 (1994) ("Brokers owe a fiduciary duty to their customers"); Restatement (Second) of Agency § 13 (1959) ("A broker-dealer acting as an agent for his customer is a fiduciary with respect to matters within the scope of his agency").

23.   Black's Law Dictionary (6th Edition) defines a fiduciary duty as "A duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person.  It is the highest standard of duty implied by law (e.g., trustee, guardian)." (Emphasis added.)

24.   As commentators have noted, fiduciaries are strictly prohibited from engaging in many activities that might be permissible in arm's-length dealings:

> A fiduciary relationship is a relationship of trust and confidence in which one of the parties (the fiduciary) owes to the other party (the beneficiary) a duty of utmost loyalty and good faith. The fiduciary duty is even more stringent than the duty owed in confidential relations. The fiduciary duty is owed by an agent to his principal and by an employee to his employer. It is also owed by a trustee to a beneficiary of a trust, by an officer or director of a corporation to the corporation and its shareholders, a partner to the partnership, by joint

venturers, and by a lawyer to his clients.  A fiduciary may not deal at
arm's length. *A fiduciary owes a duty to make full disclosure of all
relevant facts that the fiduciary knows or should know when entering
into a transaction with the beneficiary.  Moreover, the beneficiary
must understand fully his or her legal rights.* A fiduciary must deal
fairly and in good faith with the beneficiary. As Judge (later Justice)
Cardozo said "[m]any forms of conduct permissible in a workaday
world for those acting at arm's length are forbidden to those bound by
fiduciary ties. A trustee [fiduciary] is held to something stricter than
the morals of the market place. Moreover, a fiduciary must act solely
in the interest of the beneficiary, not in his or her own interest or in
the interest of a third party. The fiduciary's loyalty must be undivided,
and his or her actions must be devoted exclusively to represent and
promote the interests of the beneficiary. A fiduciary cannot compete
with the beneficiary or act on behalf of a competitor. A fiduciary may
not use or disclose confidential information obtained in the course of
the relationship for his or her own benefit or contrary to the interest of
the beneficiary. *A fiduciary may not profit secretly from the
relationship with the beneficiary.*

Robert S. Adler and Richard A. Mann, *Good Faith: A New Look at an Old
Doctrine*, 28 Akron Law Rev. 31, 34-35 (1994) (citations omitted; emphases
added).  Georgia courts agree:

[W]henever a fiduciary or confidential relation exists between the
parties to a deed, . . . the law implies a condition of superiority held by
one of the parties over the other, so that in every transaction between
them, by which the superior party obtains a possible benefit, equity
raises a presumption of undue influence, and casts upon that party the
burden of proof to show affirmatively his compliance with equitable
requisites and of entire fairness on his part and freedom of the other
from undue influence.

*Mathis v. Hammond*, 268 Ga. 158, 161 (1997) (quoting *Trustees of Jesse Parker
Williams Hosp. v. Nisbet*, 191 Ga. 821, 841 (1941)); O.C.G.A. § 23-2-58 ("Any

relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.").

25.    A fiduciary relationship existed between HTK and the Class members. HTK knew that Plaintiff and the Class members trusted HTK to recommend appropriate investments and to put its customers' interests ahead of its own. Throughout the course of their relationship, HTK sought to engender, and did in fact engender, Plaintiff and the Class members' trust and confidence in its ability and willingness properly to advance all of their investment objectives and needs.  At all times, HTK possessed superior knowledge, skill, and experience in the securities market in contrast to Plaintiff and the Class members' lack of meaningful knowledge and understanding, and Plaintiff and the Class members could not fully appreciate the true effect that the fees that were being raked from their retirement accounts would have on their investment returns.

26.    Because of the fiduciary relationship with HTK, the Class members reasonably relied to their detriment on HTK's superior knowledge, skill, and experience in handling their accounts.

27.   Because of HTK's superior knowledge, skill, and experience in the securities market, HTK owed to Plaintiff and the Class members a duty to recommend appropriate investments and to properly manage funds they entrusted to HTK. Further, HTK owed this fiduciary duty to protect and further Class members' interests over and above HTK's desire to generate fees and promote its own interests and those of its corporate parent, Penn Mutual.

28.   The retirement investment market in the United States has undergone a revolution in recent decades. Instead of guaranteed lifetime pension benefits, contributory retirement plans (like IRAs, 401(k)s, and 403(b)s) now predominate. Contributory plans require participants to manage their own retirement investments. The goal, of course, is to maximize asset accumulation for retirement.  Retirement plans are the largest assets owned by many households, yet most individuals are not well-equipped to deal with the complex considerations involved in effectively managing these assets.

29.   The sales transactions at issue in this complaint are in many instances the single most financially consequential decision many people will make in their lifetimes.  Most are unaware of the potential for financial injury and are easily confused by trusted advisors who recommend variable annuities for funding tax qualified plans.  Defendants have willfully capitalized on this point of confusion to

induce and profit from sales of deferred annuities to persons who do not benefit from them.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class: all Georgia residents who purchased an individual variable deferred annuity contract or who received a certificate to a group variable deferred annuity contract issued by The Penn Mutual Life Insurance Company, or who made an additional investment through such a contract, within the applicable statute of limitations (the "Class Period")[4] that was used to fund a contributory retirement plan or arrangement qualified for favorable tax treatment pursuant to sections 401, 403, 408, 408A, or 457 of the Internal

---

[4]     The Class Period will cover a minimum of six years, but the precise temporal limits will likely be a dispute that will need to be resolved by this Court. There is a split of authority as to whether the statute of limitations for a breach of fiduciary duty claim is six years or ten years. *Compare, e.g.,* O.C.G.A. § 9-3-27 and *Goldston v. Bank of America Corp.,* 259 Ga. App. 690, 577 S.E.2d 864 (2003) (ten years) *with Crosby v. Kendall,* 247 Ga. App. 843, 849, 545 S.E.2d 385 (2001) (six years).  In addition, Georgia law provides for tolling of the statute in the fiduciary context, so there is some chance that the Class Period could be significantly longer than ten years. *See generally Goldston* (applying ten-year statute of limitations to breach of fiduciary duty claim but allowing claim involving decades-old conduct to proceed as a result of the fiduciary's concealment).

Revenue Code.  Excluded from the Class are Defendants, any officer or director of

Defendants or entity in which Defendants had a controlling interest during the Class

Period, any member of those persons' immediate families, and the legal affiliates,

heirs, controlling persons, agents, successors and predecessors in interest or assigns

of any such excluded person or entity.

31.     The members of the Class are so numerous that joinder of all members

is impracticable.  While the exact number of Class members is unknown to Plaintiff

at this time and can only be ascertained through appropriate discovery, Plaintiff

believes that there are hundreds of members in the proposed Class. Members of the

Class may be identified from records maintained by Defendants  and may be notified

of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the other members of the

Class as all members of the Class are similarly affected by Defendants' wrongful

conduct in violation of Georgia law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members

of the Class and has retained counsel competent and experienced in class and

securities litigation.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants have favored their own interests over those of Plaintiff and the Class members by recommending that customers' tax-qualified accounts be used to fund high-fee variable annuities;

(b)    whether Defendants' conduct is a breach of the fiduciary duties required by Georgia law; and

(c)    whether the members of the Class have sustained damages and the proper measure of damages.

35.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, because joinder of all members is impracticable, and because many Class members remain unaware of the harm being done to their accounts and are therefore unlikely to seek redress on an individual basis.  There will be no difficulty in the management of this action as a class action.

## COUNT I
## BREACH OF FIDUCIARY DUTIES

36.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

37.   By virtue of HTK's brokerage firm status, the special confidence Plaintiff and the Class members reposed in Defendants, and the domination and controlling influence Defendants had, the members of the Class and Defendants had a fiduciary relationship, and Defendants owed fiduciary duties to each of the Class members.

38.   Defendants were required to act with due regard for Class members' interests and to subordinate its own selfish interests to those of Class members where their interests conflicted.

39.   Defendants have violated these fiduciary duties to the Class members by providing investment advice that was not in customers' best interests in an effort to steer Class members' money into variable annuities that would pay higher fees to Defendants.

40.   In so doing, Defendants failed to act with due regard for the Class members' interests consistent with their fiduciary duties.

41.   Plaintiff and the Class members have suffered damages as a direct result of Defendants' breach of these fiduciary duties.

42.   Plaintiff and the Class members are entitled to all possible relief, including an award for the full amount of their damages resulting from Defendants' breach of fiduciary duties, plus interest, attorneys' fees, and costs.

## COUNT II
## ATTORNEYS' FEES UNDER O.C.G.A. § 13-6-11

43.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

44.     Defendants have caused Plaintiff and the Class members unnecessary trouble and expense in their attempt to recover the amounts due them.  As such, Class members are entitled to recovery of attorneys' fees pursuant to O.C.G.A. §13-6-11 and other applicable law.

## COUNT III
## PUNITIVE DAMAGES

45.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

46.     In *Miley v. Oppenheimer & Co., Inc.,* the old Fifth Circuit cited the following passage from Stuart Charles Goldberg's book entitled *Fraudulent-Dealer Practices* in support of awarding punitive damages:

> Most courts in the past have seen fit, when they find the broker-dealer's hand in the till, to simply request the removal of the offending appendage. And when the till is empty, and the broker-dealer's fingerprints are all that remain where the money once lay, all the courts do is to require the crook to replace the booty. If ever there was a situation where crime pays it is in such circumstances; heads the dishonest broker-dealer wins and tails everyone breaks even. No wonder one commentator saw fit to term

19

> the average recovery in trading cases as creating for the broker-dealer a "low risk larceny."
>
> . . . [T]he only way of deterring such conduct in the future is to take the profit away from the wrongdoers and slap on an additional amount as punitive damages: an award equal to treble damages would be fair, reasonable, and well within the public interest.

637 F.2d 318, 332 (5th Cir. 1981).  *See also Interfinancial Midtown, Inc. v. Choate Constr. Co.*, 343 Ga. App. 793, 800 (2017) ("To say the only remedy of the creditor is in equity to set aside the [fraudulent] conveyance would be to urge the debtor to convey his property away to hinder and defraud creditors, for if he should get caught at it, no matter how fraudulent his intent or how odious the injury, the worst that could happen would be the setting aside of the conveyance . . .") (quoting *Kesler v. Veal*, 182 Ga. App. 444, 451 (1987)).

47.   This is not the first time HTK has run into trouble regarding its variable annuity sales practices.  At least two regulatory actions have been filed that resulted in six-figure fines.  *See, e.g.,* FINRA Letter of Acceptance, Waiver and Consent No. 2015043387001 (Nov. 14, 2017) (resulting in sanctions and a fine of $275,000); *see also* NASD Letter of Acceptance, Waiver and Consent No. C9A050032 (July 6, 2005) (resulting in sanctions and a fine of $325,000).

48.    In addition to the damages that naturally and normally flow from their claims, Plaintiff and the Class members are entitled to recover a sum in order to deter Defendants and others from similar conduct in the future, in an amount to be determined by the enlightened conscience of the jury.

49.    Defendants' actions have been willful, intentional, wanton, and have been done with such entire want of care as to raise the presumption of conscious indifference to consequences.

50.    Because the acts alleged herein were willful, intentional, and done with a specific intent to harm, there is no limitation on the amount of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, plus a "benefit of the bargain" calculation of additional damages, plus interest as allowed by law;

(c)    Awarding Plaintiff and the other members of the Class the

expenses of litigation, including attorneys' fees, pursuant to
O.C.G.A. § 13-6-11 or otherwise as allowed by law;

(d)     Awarding Plaintiff punitive damages in an amount sufficient to
deter Defendants and others from committing similar actions in
the future; and

(e)     Awarding such other and further relief as the Court deems
appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted this 1st day of February, 2019.

> */s/ David A. Bain*
> David A. Bain
> Georgia Bar No. 032449
> **Law Offices of David A. Bain, LLC**
> 1230 Peachtree Street, NE
> Suite 1050
> Atlanta, GA  30309
> Tel: (404) 724-9990
> Fax: (404) 724-9986
> Email: dbain@bain-law.com
>
> *Counsel for Plaintiff and the Class*