# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

FILED
U. S. DIST. COURT
BRUNSWICK DIV.

2004 OCT -8 A 9: 15

E. Taylor

SAMUEL COOPER, ALBERT FERGUSON,
AND HERBERT H. MILLER, JR., on behalf of
themselves and all others similarly situated,

Civil Action No. CV 203-131

)
)
)
)
)

Plaintiffs,

**SECOND AMENDED CLASS
ACTION COMPLAINT**

)
)

v.

Jury Demand

PACIFIC LIFE INSURANCE COMPANY; AND
PACIFIC SELECT DISTRIBUTORS, INC.,

Defendants.

)
)
)
)
)
)
)
)

Plaintiffs Samuel Cooper, Albert Ferguson, and Herbert H. Miller, Jr. (collectively,

"plaintiffs"), by their undersigned attorneys, on behalf of themselves and on behalf of all other

persons similarly situated, allege for their Amended Class Action Complaint, upon personal

knowledge as to themselves and their own acts, and upon information and belief as to all other

matters, based upon, *inter alia*, facts obtained through an investigation undertaken by and

through their attorneys, including interviews of former employees of defendants Pacific Life

Insurance Company and Pacific Select Distributors, Inc. with knowledge of defendants'

activities during the Class Period (as defined below). Plaintiffs believe that further substantial

evidentiary support will exist for their allegations after a reasonable opportunity for discovery,

especially in view of the fact that much of the evidence supporting the allegations contained in

this complaint is within the exclusive control of defendants.

## NATURE OF THE ACTION

1.    Plaintiffs bring this action as a class action under the Securities Exchange Act of

1934 (the "Exchange Act") individually and on behalf of a Class consisting of:

> All persons who purchased an individual variable deferred annuity contract or a
> certificate to a group variable deferred annuity contract issued by Pacific Life
> Insurance Company, or who made an additional investment in a separate account
> investment option under such a contract, between August 19, 1998 and April 30,
> 2002, which contract was used to fund a contributory (not defined benefit)
> retirement plan or arrangement qualified for favorable income tax treatment
> pursuant to Internal Revenue Code sections 401, 403, 408, 408A, or 457.

The covered retirement plans include traditional IRAs, rollover IRAs, Roth IRAs, 401(k) plans,

403(b) arrangements, and others. Plaintiffs are members of the Class.

2.    Under the Internal Revenue Code, insurance products are exempt from income

taxation on their inside investment build-up (earnings). The main economic value of investing

through a deferred annuity is to qualify for these tax advantages, including tax deferral of

earnings and the ability to switch among different investment accounts inside the annuity without

triggering current taxation. However, for persons funding retirement plans (for example, 401(k)

plans and IRAs), these tax advantages are unnecessary and redundant because, under the Internal

Revenue Code, such retirement plans are already automatically tax deferred (also referred to as

"tax-qualified") regardless of the investments placed in the plans.

3.    As set forth in detail below, defendants nevertheless target sales of variable

annuities to persons seeking to fund tax-qualified retirement plans. In recommending these

sales, defendants uniformly omitted to disclose to prospective purchasers that the main economic

value of such annuities (tax deferral) is unnecessary and redundant for them, as qualified plan

investors. Defendants also uniformly failed to disclose that a variable annuity is a suitable

investment only when an insurance need supports the recommendation. As a result, plaintiffs

2

and the other members of the Class have suffered, and continue to suffer, economic injuries as a result of paying fees and other detriments, including surrender penalties, associated with the insurance aspects of these products -- which plaintiffs and the Class members would not have agreed to pay if defendants had made full and fair disclosure of the facts omitted as alleged herein.

4.     Defendant Pacific Life Insurance Company ("Pacific Life") is a stock life insurance corporation wholly-owned by Pacific LifeCorp, which is, in turn, 98% owned by Pacific Mutual Holding Company ("PMHC"). PMHC was established in 1997 in connection with the company's conversion to a mutual holding company structure. Defendant Pacific Select Distributors, Inc. ("PSD") is a broker-dealer member of NASD Regulation, Inc. ("NASDR") and securities distributor for Pacific Life. PSD also performs, on an agency basis, marketing support services on behalf of Pacific Life in the sale of its variable annuities. Pacific Life and PSD enter into selling agreements with affiliated and third-party broker-dealers under which these broker-dealers, and their associated registered representatives, act on an agency basis for Pacific Life and PSD in the solicitation and sale of variable annuities. In addition, the registered representatives selling Pacific Life variable annuities are appointed by Pacific Life with state insurance departments to act as agents on Pacific Life's behalf in the solicitation and sale of variable annuities.[1]

---

[1]     A variable annuity is a hybrid insurance and investment product. The securities component consists of units of interest in a separate account that are registered as securities under the Securities Act of 1933. The separate account is registered as an investment company in compliance with the Investment Company Act of 1940 (ICA). The insurance components of variable annuities consist of an annuity insurance contract issued by a state-regulated insurance company, and interests in one or more fixed accounts that invest in the general account of a state-regulated insurance company. As a writer of insurance, an insurance company issuing variable annuities typically claims the "insurance company" exemption from ICA regulation provided at

3

5.  Plaintiffs and Class members had no reason to suspect that insurance companies command high fees for insurance and impose the other detriments associated with variable annuities because of the valuable tax advantages of the product -- tax advantages plaintiffs and the Class members would already automatically enjoy regardless of whether they funded their qualified plan with a deferred annuity.

6.  Defendants' conduct is contrary to minimum industry standards for financial service providers. For example, in May 1999, NASDR issued a reminder to its members, including defendant PSD, that they must fulfill their duties of fair dealing when selling variable annuities, including having adequate supervisory procedures in place to ensure that selling agents have performed a product suitability analysis to ascertain whether the product's tax and insurance features meet the customer's needs. NASDR also reminded its members that when recommending a variable annuity for funding a tax-qualified retirement plan, a sales agent has an affirmative duty to disclose to the prospective purchaser that "the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary." *See* NASD Notice to Members 99-35, *The NASD Reminds Members of Their Responsibilities Regarding the Sales of Variable Annuities* (May 1999) ("NASDR NTM 99-35").

7.  In selling variable annuities through agent distributors that have not made adequate disclosures and suitability determinations, as described above, defendants and their agents have violated their duties under the Exchange Act not to omit material information in

---

Section 3(c)(3) in the ICA. In so doing, the insurance company avoids having to comply with the numerous important investor protections of the ICA in the sale of variable annuities.

4

connection with the sale of securities, and not to make sales without performing an appropriate suitability analysis.

8.      As set forth in detail below, Class members who were sold variable annuities to fund their qualified plans have suffered severe economic harm over time. By retirement age, insurance fees and other detriments of variable annuities (described more fully below) cause the loss of up to one-third of a retirement investor's account value, as compared to straight investment products such as mutual funds. Moreover, once consumers purchase a variable annuity, they are trapped for many years because high surrender fees inhibit them from exiting the arrangement.

9.      Defendants' violations of the Exchange Act have been intentional. The insurance and surrender fees charged to annuity owners (which are in addition to investment management fees and contract administration fees) yield much greater income to defendants than would be realized from the sale of straight mutual funds providing the same investment options. This greater income provides additional profits to defendants and additional compensation to the selling agents -- who receive commissions two to ten times higher on variable annuity sales as compared to sales of mutual funds. Defendants and their sales agents failed to make meaningful disclosures and proper suitability determinations because they know that a fully informed qualified retirement plan purchaser will reject the notion that using a variable annuity to fund a qualified plan is in the best interest of the investor.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§1331 and 1337.

11. Venue is proper in this district under 28 U.S.C. § 1391 because the wrongs alleged in this complaint occurred, in substantial part, in this District. Specifically, materially deceptive sales tactics and omissions occurred in this District; and defendants' variable annuities are advertised, marketed and sold in this District.

12. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone and data communications, in connection with the acts and conduct alleged herein.

## PARTIES

### A. PLAINTIFFS

13. Plaintiff Samuel Cooper is a citizen of the State of Georgia and resides in Brunswick, Georgia. He was sold a Pacific Life deferred variable annuity during the Class Period, as set forth in his certification filed with the Court, and has been damaged thereby. Samuel Cooper attended one or more seminars, held at a local Holiday Inn, for current and/or retired employees of Georgia Pacific Corporation. The seminars were conducted by Carol Hanlon, who held herself out as a financial advisor associated with Salomon Smith Barney. Thereafter, Samuel Cooper met individually with Ms. Hanlon at her office in Ponte Vedra, Florida. Acting as agent of Pacific Life, Ms. Hanlon recommended that Mr. Cooper transfer his company pension monies to a rollover IRA funded by a Pacific Life variable annuity. Ms. Hanlon did not at any time disclose that the tax deferral feature of a deferred annuity is not necessary for a rollover IRA. On or about May 18, 1999, Pacific Life issued to Mr. Cooper a Pacific Portfolios Individual Flexible Premium Deferred Variable Annuity (contract no. 99405980) to fund his rollover IRA. On or about May 22, 2003, Mr. Cooper met with a legal advisor to ascertain whether any wrongdoing had occurred in connection with his purchase of the

6

variable annuity. During this meeting, Mr. Cooper learned for the first time that the tax advantages of a deferred annuity are unnecessary for IRA investors, and that the insurance company commands high fees due to the value of the tax features of the product. If Mr. Cooper had been told before his purchase that a variable annuity was unsuitable, and that the tax advantages of the product are redundant and unnecessary for him, he would not have agreed to purchase the product. Mr. Cooper's contract is still subject to a surrender penalty, which has impeded his ability to exit this product.

14.     Plaintiff Albert Ferguson is a citizen of the state of Georgia and resides in Brunswick, Georgia. In 1999, Mr. Ferguson attended one or more seminars, held at a local Holiday Inn, for current and/or retired employees of Georgia Pacific Corporation. The seminars were conducted by Carol Hanlon, who held herself out as a financial advisor associated with Salomon Smith Barney. Thereafter, Mr. Ferguson met individually with Ms. Hanlon at her office in Ponte Vedra, Florida. Acting as agent of Pacific Life, Ms. Hanlon recommended that Mr. Ferguson transfer his company pension monies to a rollover IRA funded by variable annuities, of which $200,000 was invested in a Pacific Life variable annuity. Ms. Hanlon did not at any time disclose that the tax deferral feature of a deferred annuity is not necessary for a rollover IRA. On or about April 27, 2000, Pacific Life issued to Mr. Ferguson a Pacific Portfolios Individual Flexible Premium Deferred Variable Annuity (contract no. VR00401197) to fund his rollover IRA. In August 2004, Mr. Ferguson learned in the course of discussions with Samuel Cooper and his attorneys that the tax advantages of variable annuities are unnecessary for rollover IRAs and constitute a main economic value of the product. If Mr. Ferguson had been made aware before his purchase of the Pacific Life variable annuity that the fees and surrender charges of the product are high because life insurers command a premium for

7

the valuable tax shelter feature of the product, and that all of the tax advantages are unnecessary for qualified plan investors, he would not have purchased it. Mr. Ferguson's contract is still subject to a surrender penalty, which has impeded his ability to exit this product.

15.    Plaintiff Herbert H. Miller, Jr. is a citizen of the state of Georgia and resides in Brunswick, Georgia. In 1999, Mr. Miller attended one or more seminars, held at a local Holiday Inn, for current and/or retired employees of Georgia Pacific Corporation. The seminars were conducted by Carol Hanlon, who held herself out as a financial advisor associated with Salomon Smith Barney. Thereafter, Ms. Hanlon visited Mr. Miller at his home for an individual meeting. Acting as agent of Pacific Life, Ms. Hanlon recommended that Mr. Miller transfer his company pension monies to a rollover IRA funded by variable annuities, of which $229,000 was invested in a Pacific Life variable annuity. Ms. Hanlon did not at any time disclose that the tax deferral feature of a deferred annuity is not necessary for a rollover IRA. On or about April 27, 2000, Pacific Life issued to Mr. Miller a Pacific Portfolios Individual Flexible Premium Deferred Variable Annuity (contract no. VR00401195) to fund his rollover IRA. On or about July 28, 2003, an agent representing another insurance company, who saw the Pacific Life variable annuity in Mr. Miller's IRA, recommended that Mr. Miller replace the Pacific Life variable annuity with another variable annuity, causing Mr. Miller to pay a surrender penalty to Pacific Life. In August 2004, Mr. Miller learned in the course of discussions with Samuel Cooper and his attorneys that the tax advantages of variable annuities are unnecessary for rollover IRAs and constitute a main economic value of the product. If Mr. Miller had been made aware before his purchase of the Pacific Life variable annuity that the fees and surrender charges of the product are high because life insurers command a premium for the valuable tax shelter feature of the

8

product, and that all of the tax advantages are unnecessary for qualified plan investors, he would not have purchased it.

**B.    DEFENDANTS**

16.    Defendant Pacific Life is organized as an insurance company under the laws of the State of California and maintains its headquarters in Newport Beach, California. Pacific Life describes itself as the 15th largest insurance company in the nation as measured by 2002 admitted assets. Pacific Life is licensed to sell annuities in the District of Columbia and all states except New York.

17.    Defendant PSD is a wholly-owned subsidiary of Pacific Life. Pacific Life and PSD enter into selling agreements with broker-dealers, under which such broker-dealers and their associated persons act as agents of Pacific Life and PSD in the sale of variable annuity contracts.

## DEFENDANTS' WRONGFUL CONDUCT

**A.    THE STRUCTURE OF PACIFIC LIFE'S VARIABLE ANNUITIES**

18.    Deferred annuities are a different product from traditional annuities. In the traditional sense, an annuity is the reverse of life insurance. Life insurance pools the risk of a premature death, while a traditional annuity pools the risk of living too long. When a consumer purchases a traditional annuity, the consumer typically acquires, in exchange for an up-front premium payment, the right to a stream of periodic payments from the insurer that is guaranteed to continue for as long as the annuitant is alive. This type of annuity can provide comfort and protection for persons who are afraid that they may outlive their assets. To find the best deal, consumers can shop for an annuity that provides the highest benefits in comparison with the premium paid in, also taking into consideration the fact that the financial strength of the issuing

9

life insurance company is the sole basis of its payment guarantee. This traditional annuity is a product sold by the insurance industry known as an "immediate annuity" (payout annuity) because annuity payments to the contract owner (or purchaser) begin immediately after she tenders the premium to the insurer.

19.    In contrast to an immediate annuity, a deferred annuity -- the type of annuity at issue in this complaint -- is an accumulation product. As a leading authority comments:

> It is important to keep in mind that there are two different products called "annuities" offered by the insurance industry, and they have very little in common. The first such product, the deferred annuity, is basically an investment vehicle. Deferred annuities . . . have settlement options which provide a periodic income, but the settlement options are most often not elected and almost never play an important part in the purchase or selection of a particular deferred annuity.

Albert E. Easton and Timothy F. Harris, *Actuarial Aspects of Individual Life Insurance and Annuity Contracts* 20 (ACTEX Publications 1999). With a deferred annuity, the purchaser invests money and intends the value of the account to grow (which growth depends upon the performance of the chosen investment vehicle) prior to using the accumulated account assets during retirement.

a.    *Fixed and variable deferred annuities*. Within a deferred annuity, there are a limited number of investment options. In fixed accounts funding a deferred annuity, the purchaser receives from the insurer an interest rate on the amount of premiums paid into the product by the purchaser; the insurer may contractually agree to a particular rate for a period of time, but more typically the insurer adjusts the rate at its discretion. In variable accounts funding a deferred annuity, the purchaser receives "units" representing interests in one or more "subaccounts" of a separate account sponsored by the insurer, containing equity, bond or money market portfolios, which are usually managed by outside investment managers (and can be managed and named so as to mimic well-known "brand name" mutual funds offered by those

10

managers, even though they are different investments and may have a somewhat different performance record). A deferred annuity offering both fixed and variable accounts is called a combination deferred annuity.

      b.    *Deferred annuities are tax shelters.* A deferred annuity is an instrument, as is a qualified retirement plan, set up to obtain special tax benefits for investors. Tax deferral on earnings in a deferred annuity is provided by the Internal Revenue Code, 26 U.S.C. § 72 (2003), and allows the purchaser to accumulate greater wealth for retirement.

      c.    *Annuitization of a deferred annuity is the purchase of a payout annuity.* At a date selected by the owner, withdrawals can be made from a deferred annuity. The owner may take an immediate lump sum or a periodic withdrawal plan of some or all of his investment. Or, as another payout option, he may "annuitize," which is essentially the purchase of a payout annuity. Under current tax law, the tax deferral advantage of the product is present regardless of whether the account balance is ever actually converted into a payout annuity.

      d.    *A payout annuity option is available to anyone.* A payout annuity can be purchased with some or all of the money in any retirement account, regardless of the investment funding the plan. It is not necessary to buy a deferred annuity in order to be able to obtain a payout annuity income stream.

    20.    Variable annuities typically contain two insurance features: specified minimum annuity purchase rates for the annuity payout options, and a "death benefit" that contractually provides that if the account owner dies during the investment period, his or her heirs receive some defined amount (for example, the principal amount invested) even if the value of the investment has decreased materially at that time.

11

21.     However, the life insurance industry's own experts have conceded that the value of these insurance features of a deferred variable annuity is so nominal that informed consumers would not choose to buy the product in the absence of a tax deferral benefit. For example, Michael Lane, president of AEGON Financial Services Group, reportedly reminded his colleagues of the reality that the "death benefit feature is a waste" for buyers because, of the contract holders who die, the number "actually benefiting from the death benefit [is] statistically irrelevant." *National Underwriter-Life/Health* at 15 (Feb. 22, 1999).

22.     Because of their tax-deferred status (as opposed to their insurance features), deferred annuities are potentially attractive financial products to people who have long-term investment objectives and for whom tax deferral is beneficial (although studies show that it takes several decades before the benefits of tax deferral begin to outweigh the drag of the annuity's higher fees). Thus, deferred annuities are marketed by scrupulous companies as being potentially appropriate retirement investments only for individuals who have already made their maximum contributions to IRAs, 401(k)s or other qualified plans available to them, and are looking for an additional tax-deferred retirement investment vehicle.

23.     Financial experts who are not biased by an affiliation with a variable annuity seller have consistently concluded that variable annuities are *not* appropriate for tax-qualified retirement plans. Scrupulous sellers of variable annuities (including many of the nation's largest annuity sellers, such as Fidelity, Vanguard and Charles Schwab) refrain from marketing or selling deferred variable annuities for placement in qualified plans, and prominently disclose in sales materials that the product is not appropriate for persons who have not already fully funded their qualified plans.

12

24.     In its first-ever consumer brochure addressing the sale of annuities, issued in June 2000, in an attempt to address deception in the marketplace, the SEC warned that variable annuities provide tax advantages that are unnecessary for qualified plan investors and the product is generally not suitable for qualified plan investors. "For most investors, it will be advantageous to make the maximum allowable contributions to IRAs and 401(k) plans before investing in a variable annuity."

## B.     REGULATION OF DEFERRED ANNUITIES

25.     The variable annuities sold by defendants contain various components with different characteristics. The separate account, which contains subaccounts that each hold a portfolio of equities or bonds or other investments, is federally regulated as an investment company, and (if no exemption applies) the interests in the separate account available under the variable annuity contract are registered as securities and sold pursuant to federal securities law requirements.

26.     The sale of variable annuities at issue in this case also involves the issuance of an individual insurance contract, or issuance of an individual certificate to a group annuity, directly between Pacific Life, and plaintiffs or other Class members. These insurance contracts are regulated as insurance. Pacific Life's variable annuities also contain one or more fixed accounts, also regulated as insurance, which provide contract owners with interests in the general account of Pacific Life.

## C.     DEFENDANTS' CONTROL OF THE SALES PROCESS

27.     Pacific Life's relationship with its sales agents is one in which the agents are the functionaries of Pacific Life in inducing sales of deferred annuity contracts (unlike, for example,

13

the situation with issuers of stocks, bonds and mutual funds vis-a-vis stockbrokers, between whom there typically is no such relationship).

28. State insurance law requirements also impose a non-delegable duty on life insurers, such as Pacific Life, to supervise sales of their variable annuities (regardless of whether the sales agents' appointment by Pacific Life is exclusive). Pursuant to regulatory requirements, Pacific Life prepares or pre-approves each piece of advertising and sales material used to effect sales of its deferred annuities. Agents are forbidden to use any sales material in the promotion of Pacific Life products that has not been approved by Pacific Life. Each annuity application is forwarded to Pacific Life, which easily ascertains from information on the application whether the deferred annuity will be used to fund a qualified plan. Pacific Life has sole authority to determine whether to issue the contract for that particular purpose.

29. Pacific Life and PSD enter into selling agreements with non-affiliated broker/dealers who act in an agency capacity for Pacific Life and PSD in the solicitation and sale of variable annuities. Pacific Life and PSD are responsible for ensuring that broker/dealers contracted to sell their products on an agency basis are in compliance with state insurance and federal securities laws applicable to these products, and that sales practices conform to the NASDR Conduct Rules.

30. In selling variable annuities, defendants train their agents to target people who are looking to fund qualified retirement plans. Defendants and their agents particularly seek out persons, such as plaintiffs, who have large amounts in corporate retirement plans and who need a rollover IRA to preserve the tax-deferred status of the money. A former Pacific Life regional marketing employee based in Florida, who was employed by the company throughout the entire Class Period, stated that there was a "big push" from top management at Pacific Life to target

14

rollover IRA investors: "The majority of the assets that we see is IRA dollars … they emphasized it because that's where the money is. That's their market."

**D.     DEFENDANTS' COMPENSATION STRUCTURE FOR THEIR AGENTS ENCOURAGES ANNUITY SALES WITHOUT FULL DISCLOSURE**

31.     By virtue of the fact that sales agents are acting within the scope of their agency relationship with defendants in selling defendants' deferred annuities for qualified plans, the deficiencies in the manner in which these sales are affected are the responsibility of, and imputed to, defendants as principals. In addition, the deceptive sales practices at issue in this complaint are directly conceived, orchestrated, ratified and affirmed by the defendants, as described above.

32.     Marketplace competition has dramatically reduced the sales compensation (commissions) paid to intermediaries for sales of mutual funds and many other financial products. By contrast, the commissions paid for sales of deferred annuities are now among the highest available in the market, and are typically two to ten times higher than the prevailing commission rate for mutual funds.

33.     Defendants promote the high commissions of variable annuities to their agents compared to mutual funds, but omit any training on the necessity to disclose to the customer that the tax advantages of variable annuities are unnecessary and that a suitability determination requires the finding that an insurance need is met by the product.

34.     Pacific Life also encourages the sales agents to sell annuities rather than mutual funds for qualified plans by structuring agents' compensation to provide greater commissions if the client purchases an annuity. According to a former Pacific Life regional marketing employee based in Texas, the commissions for selling annuities were a major incentive for the agents because the payouts were higher upfront and on an ongoing basis. Moreover, the "grid" (an

15

ascending scale of commission based on total sales) by which bonuses are calculated is typically higher for annuities than mutual funds.

35.     In addition to paying higher agent commissions, sales of variable annuities pay higher compensation for marketing employees, who are given incentives to favor variable annuities over mutual funds.

**E.     DEFENDANTS INTENTIONALLY TARGET QUALIFIED PLAN INVESTORS FOR SELLING VARIABLE ANNUITY SALES WITHOUT MAKING THE REQUIRED DISCLOSURES**

36.     In addition to providing materially higher commissions than those for comparable mutual funds, deferred annuities are one of the last remaining tax shelters available to the public. As a result of these factors, deferred annuities have grown in recent years from relative obscurity to the largest business segment of the United States life insurance industry. Sales of variable deferred annuities soared to a reported $111.1 billion in calendar year 2002, compared to $4.6 billion in 1987. There is nearly $800 billion of U.S. retirement savings now invested in these products.

37.     Meanwhile, the retirement investment market in the United States has undergone a revolution over the last two decades. Instead of guaranteed lifetime pension benefits calculated based on retirees' life expectancies, modern contributory retirement plans -- including IRAs, 401(k)s and 403(b)s -- now predominate. Contributory plans require participants to manage their own retirement investments. The goal is to maximize asset accumulation for retirement. Investment growth on a tax-deferred basis, accordingly, has become a key consideration. Retirement plans are the largest assets owned by many households (larger than home equity), yet most individuals are not well-equipped to deal with the complex considerations involved in effectively managing these assets.

16

38. The sales transactions at issue in this complaint (particularly those involving funds reinvested into rollover IRAs) are in many instances the single most financially consequential decision many persons will make in their lifetimes. Given the simultaneous growth in recent years of tax-deferred investments (*e.g.*, deferred annuities) and tax-deferred contributory retirement savings plans, many people are unaware of the potential for financial injury and are easily confused by trusted advisors who recommend variable annuities for funding qualified plans. Defendants have willfully capitalized on this point of confusion to induce and profit from sales of deferred annuities to persons who do not benefit from them. According to a former marketing employee at Pacific Life's home office, who left the company in April 2002, there was a "big focus" at the company on IRA rollover dollars and to push the agents to sell the variable annuity since the clients do not know the difference. The client "doesn't need it, but the rep likes his commission and the client's not savvy enough to understand what he's really doing." Another former marketing employee at Pacific Life's home office, who left the company in March 2002, stated that qualified plans accounted for much of the money invested in variable annuities at Pacific Life and that the tax issues were never discussed in her training. While at Pacific Life, she expressed doubts about the appropriateness of pushing annuities for qualified plans but Pacific Life management insisted it was a "good thing to do." Yet the clients "really don't know what [they're] putting [their] money into, and then there's fine print and there's all those other fees, and I know I sold this stuff, but . . ."

39. Defendants target their sales efforts to market segments containing persons who are typically not sophisticated about retirement investments. For example, defendants' sales materials include explanations of basic terms and seek to introduce investors to basic concepts like tax deferral, explaining why it would be of value to have tax deferral as part of a retirement

savings plan. In contrast, scrupulous marketers of deferred annuities devote prominent portions of their advertising and sales materials to inform consumers that a deferred annuity should not be considered until after consumers have fully funded their qualified plans.

### F. DEFENDANTS' DISCLOSURE DUTIES

40. Defendants had a duty to disclose to prospective purchasers of Pacific Life variable annuities for placement in qualified retirement plans that the main economic benefit of the product, tax deferral, was unnecessary and redundant for them, and that such annuities could be a suitable investment only when a specific insurance need supports the purchase. An insurance need is unlikely to be met by the product because the death benefit feature of a variable annuity is an inefficient method of purchasing life insurance. Unlike life insurance, which pays a tax-free death benefit, any death benefit paid on a variable annuity in excess of tax basis is taxable to heirs.

41. Defendants' disclosure duty is based on federal laws and regulations requiring full and fair disclosure in the sale of securities; NASD Conduct Rules, which impose a duty of fair dealing; and state laws and regulations including unfair insurance trade practices statutes.

42. Compliance with the NASD Conduct Rules is mandated by the federal securities laws. In an interpretation of the duty of fair dealing imposed by the Conduct Rules, the NASDR stated in NASDR NTM 99-35 that "when a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary." The sales practice guidelines therein constitute a broad

18

consensus of the industry itself. *See, e.g.,* NASDR NTM 99-35 (99-35 is intended to "represent

a compilation of industry practices in the supervision of the sale of variable annuities").

43.     At a speech at the National Association for Variable Annuities (NAVA)

Regulatory Affairs Conference on June 28, 1999, Paul Roye, the SEC's Director of the Division

of Investment Management, stated:

> Whether a life insurance company has a captive or independent sales force, or
> distributes its products through intermediaries, controls must be in place to
> prevent sales practice abuses to the greatest extent possible.

*   *   *

> Effective internal controls to prevent, detect, and correct misleading or abusive
> sales practices are essential.

The SEC staff has also stated that "during inspections they will scrutinize insurers to make sure

they are conducting a suitability review."

44.     The unfair insurance trade practices statutes enacted in each of the 50 states

requires fair dealing in the sale of insurance products, including full disclosure of material

information in connection with the sale of variable annuities.

## G.     DEFENDANTS' MATERIAL OMISSIONS

45.     Defendants and their agents sold deferred variable annuity contracts by failing to

disclose material facts to plaintiffs and the members of the Class or their employers.

46.     In each transaction at issue, defendants and their agents made a recommendation

of a variable annuity to fund a qualified plan, which, as discussed above, triggered the duty to

make the disclosures set forth in NASDR NTM 99-35. Nevertheless, defendants failed to

explain that the tax deferral feature of a variable annuity is redundant and unnecessary, and failed

to disclose that a variable annuity is a suitable investment only when an insurance need supports

the recommendation. These material facts were also uniformly omitted from agent training and

19

education materials, prospectuses, and consumer brochures prepared and distributed by defendants.

47.    Pacific Life agents are not trained to explain that the tax deferral benefits of an annuity are redundant and unnecessary. For example, a former Pacific Life regional marketing employee who was responsible for promoting Pacific Life products to the agents, and who was with the company throughout the entire Class Period, stated that Pacific Life provided no written or verbal training regarding the necessary tax redundancy disclosure to its marketing employees. Moreover, these employees were never trained to instruct Pacific Life's agents to make the necessary disclosures. Further, no supervisory procedures were in place to ensure that Pacific Life's broker/dealer marketing partners were providing written or oral disclosure that the tax advantages of the product are unnecessary or that suitability requirements were enforced.

48.    A former marketing employee at Pacific Life's home office, who left the company in August 2002, whose job duties consisted of promoting Pacific Life products to the field force (in his words, "raise sales by any means necessary"), stated that he was never instructed to speak with the agents about making disclosures to qualified plan investors ("not at all"). Referring to IRA rollovers, he stated that management at Pacific Life "just salivated over stuff like that" because "they said it was an easy sell because you could tell the broker to tell the client 'you already have a tax-deferred plan, a VA's the same way, roll that puppy over'." This marketing employee further stated that Greg Darm, who was responsible for training the marketing employees, never discussed the tax redundancy issue at any time with the marketing employees.

49.    Marketing employees were trained to overcome specific objections by agents to selling Pacific Life's promotion to them to sell variable annuities to fund qualified plans, given

20

that the qualified plan already provides all the tax advantages of a variable annuity. Specifically, the employees were told by supervisors to respond that variable annuities were suitable for qualified money because of the incidental insurance benefits. According to a Pacific Life agent in Northern California, Pacific Life marketing employees instructed him to only talk about the tax redundancy issue if the client raises the issue first, and then discuss the death benefit feature of the contract as a reason to buy it. According to the Pacific Life agent, if he discussed the tax redundancy issue proactively with the client, it would hurt his ability to make the sale. A former Pacific Life regional marketing employee based in Texas stated that, in his meetings with agents to promote annuity sales, "when you are writing on the grease board, you're not exactly putting the tax issue on there. [You're selling] the sizzle. That's the way it works." Moreover, according to this Texas-based employee, the reality is that his former colleagues at Pacific Life "didn't care" about the tax redundancy issue ("I'll be honest with you, they didn't care") because "they're going to go out and do their sizzle presentation and try and do as much business as they can." Similarly, the Pacific Life sales agents, according to the Texas-based marketing employee, in their meetings with prospective buyers, are not going to bring up the tax redundancy issue, because it is not a benefit of buying the product. "They would never talk about it as a negative - 'by the way, this is already tax-deferred and you're putting it into a tax-deferred account.'" But as a result, the Texas-based employee states, "it's a lousy deal for the investor. I truly believe they are being mis-sold."

50.     Another former regional marketing employee, based in Kansas, stated that he "never bought into" Pacific Life's management's insistence that variable annuities were suitable for qualified plans ("the company line") and "I think a lot of people have gotten screwed to be honest with you." This employee often sat in at meetings between Pacific Life sales agents and

clients, and would watch as the agent ignored the issue of tax redundancy and simply made the sale. He understood the agent was attracted by the big commission, such as "raking in a $8,000 commission check in one transaction," but "it's not right for the client."

51.     Defendants know that variable annuities are only potentially appropriate for customers in certain circumstances, but failed to ensure that their sales agents were making full disclosures when promoting the product to persons who did not need a main economic value of the product.

## H.     DEFENDANTS' CONCERTED ACTIVITY AS JOINT CONSPIRATORS

52.     Advertising, sales presentation and other materials used in connection with the sale of defendants' insurance products to the public, including computer software used to generate such materials, are developed, approved, and disseminated by all defendants.

53.     Other joint activities of the defendants include interacting with the general public through common facilities, including the same customer service support centers and their shared Internet web sites at www.pacificlife.com.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. As stated above, the Class consists of:

> All persons who purchased an individual variable deferred annuity contract or a certificate to a group variable deferred annuity contract issued by Pacific Life Insurance Company, or who made an additional investment in a separate account investment option under such a contract, between August 19, 1998 and April 30, 2002, which contract was used to fund a contributory (not defined benefit) retirement plan or arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401, 403, 408, 408A, or 457.

Excluded from the Class are defendants, defendants' officers and directors, those persons' immediate families, and the successors and predecessors of any such excluded person or entity.

22

55.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is not known to plaintiffs at this time, purchasers of defendants' variable annuity contracts are believed to number in the thousands, and are widely dispersed geographically. Class members may be identified from the records maintained by defendants and may be notified of the pendency of this action using a form of notice and dissemination methods similar to those customarily used in other class actions.

56.     Plaintiffs' claims are typical of the claims of the other members of the Class. Defendants made the same material omissions in selling their variable annuities to plaintiffs and all of the members of the Class. Plaintiffs and the members of the Class suffered the same type of harm resulting from defendants' wrongful conduct complained of herein.

57.     Plaintiffs are representative parties who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action securities litigation.

58.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually seek redress for the wrongful conduct complained of herein.

59.     Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

60.     Common questions of law and fact predominate over any questions affecting individual members of the Class. The common questions include, among others:

a.      whether those omissions were material;

23

b.      whether defendants and their agents acted with knowledge or reckless disregard of the truth;

c.      whether those omissions caused injury to the members of the Class, and what is the appropriate measure of damages;

d.      whether Pacific Life and/or PSD were controlling persons of sales agents under Section 20(a) of the Exchange Act;

e.      whether Pacific Life's contracts are void pursuant to Section 29(b) of the Exchange Act;

f.      whether rescission and restitution of contract insurance charges are available remedies to members of the Class; and

g.      whether injunctive relief in the form of waivers of surrender penalties or other equitable relief is appropriate.

## COUNT ONE

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

61.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

62.     A unit of interest in a separate account funding a variable deferred annuity is a security subject to the Exchange Act, including Section 10(b) and Rule 10b-5 promulgated thereunder, because the units of interest possess characteristics that are similar to those of investment securities.

63.     Defendants and their agents employed devices, schemes or artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and the Class in connection with the purchase and sale of securities. Defendants failed

24

to disclose that the tax deferral feature of a variable annuity is unnecessary for qualified plan investors, and that any permissible investment funding the qualified plan will enjoy the tax benefits automatically provided by the qualified plan. Defendants failed to disclose that an insurance need must be found to have been met by the product to justify the suitability of the product for funding a qualified plan.

64. These material omissions deceived and misled plaintiffs and the other members of the Class. Had plaintiffs and the other members of the Class known the truth, they would not have purchased Pacific Life's variable annuity contracts.

65. Defendants' omissions were made with scienter, as described in this complaint.

66. Plaintiffs and the members of the Class were damaged thereby.

## COUNT TWO[2]

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

67. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

68. By reason of Pacific Life's control of their sales agents, as well as its own culpable participation, defendants are controlling persons within the meaning of Section 20(a) of the Exchange Act.

69. By reason of PSD's control of broker/dealers who have entered into agency selling agreements, and their associated registered representatives, as well as its own culpable

---

[2]     Plaintiffs recognize that the Court dismissed this Count in its Order, dated July 12, 2004. Plaintiffs include this Count in the Second Amended Class Action Complaint for appeal purposes only.

participation, PSD is a controlling person within the meaning of Section 20(a) of the Exchange
Act.

### COUNT THREE

#### Violation of Section 29(b) of the Exchange Act Against All Defendants

70.     Plaintiffs repeat and reallege each and every allegation contained above as if fully
set forth herein.

71.     A unit of interest in a separate account funding a variable deferred annuity is a
security subject to the Exchange Act, because the units of interest possess characteristics that are
similar to those of investment securities.

72.     Defendants issued securities to plaintiffs and members of the Class on or after
August 19, 1998 through material omissions in violation of Section 10(b) of the Exchange Act.

73.     Plaintiffs and the members of the Class are entitled to elect to void their contracts
with Pacific Life pursuant to Section 29(b) of the Exchange Act because the contracts were made
in violation of, and performance involves violations of, the Exchange Act, and to obtain
appropriate restitution, including waiver or return of surrender penalties, and all other fees,
charges, revenue, profits and/or unjust enrichment obtained by Pacific Life through the business
of selling and issuing variable contracts to plaintiffs and Class members in violation of the
Exchange Act.

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for relief and
judgment as follows:

a.     Determining that this action is a proper class action under Rule 23 of the
Federal Rules of Civil Procedure;

26

b.    Determining that statutory relief pursuant to Section 29(b) is available to plaintiffs and the Class members because Pacific Life's making and performance of contracts with plaintiffs and the Class members involves violations of the Exchange Act, and that such contracts are voidable and unenforceable at the election of plaintiffs and each member of the Class;

c.    Awarding restitution of all contract charges paid by plaintiffs and the members of the Class to Pacific Life, including pre-judgment interest, and enjoining the imposition of any contract surrender penalties;

d.    Disgorgement of unjust enrichment, including revenues received through violations of the Exchange Act;

e.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants for all damages sustained as a result of defendants' wrongdoing, in amounts to be proven at trial, including pre-judgment interest thereon;

f.    Awarding injunctive or other equitable relief in favor of plaintiffs and the other Class members;

g.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

h.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 6, 2004

MILBERG WEISS BERSHAD
& SCHULMAN LLP

By: *Janine L. Pollack*

Michael C. Spencer
Janine L. Pollack
Lee A. Weiss
Brian C. Kerr
One Pennsylvania Plaza
New York, NY 10119-1065

*Plaintiffs' Lead Counsel*

**TUCKER, EVERITT, LONG,
BREWTON & LANIER**
Thomas W. Tucker
453 Greene Street
P.O. Box 2426
Augusta, GA 30903-2426

*Plaintiffs' Liaison Counsel*

**UITZ & ASSOCIATES**
Ronald A. Uitz
1717 K Street, N.W., Suite 600
Washington, D.C. 20036

**THE LUSTIGMAN FIRM, P.C.**
Sheldon S. Lustigman
Andrew B. Lustigman
149 Madison Avenue, Suite 805
New York, NY 10016

**COOPER RIDGE & LANTINBERG**
Richard J. Lantinberg
1200 SunTrust Bank Building
200 West Forsyth Street
Jacksonville, FL 32202

*Attorneys for Plaintiffs*

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the Second Amended Class Action Complaint has been

served upon the following parties by placing a copy of same in the United States Mail, first class

postage pre-paid, on this 6th day of October, 2004.

**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
James R. Carroll, Esq.
Kurt Wm. Hemr, Esq.
One Beacon Street
Boston, MA 02108-3194

Dated: October 6, 2004
     New York, New York

                                   Guy Halfteck