# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JEFFREY A. COCHRAN, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>      v.<br><br>THE PENN MUTUAL LIFE INSURANCE COMPANY and HORNOR, TOWNSEND & KENT, LLC,<br><br>               Defendants. | Civil Action No.<br>1:19-CV-564-TCB<br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

By and through his undersigned counsel, Plaintiff Jeffrey A. Cochran ("Plaintiff"), alleges the following against The Penn Mutual Life Insurance Company ("Penn Mutual") and Hornor, Townsend & Kent ("HTK") (collectively, "Defendants"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Defendants and other related parties and non-parties with the Financial Industry Regulatory Authority ("FINRA"), the

U.S. Securities and Exchange Commission ("SEC") and other regulatory authorities; (b) review and analysis of press releases, marketing materials, and other publications disseminated by Defendants and other related parties and non-parties; and (c) review of news articles and investor communications.

## NATURE OF THE ACTION

1.     This is a class action seeking to challenge Defendant HTK's self-serving practice of recommending that customers' tax-qualified accounts, such as IRAs, be used to fund variable annuity contracts, specifically those issued by its parent, Defendant Penn Mutual.

2.     A variable annuity is a hybrid insurance and investment product. Under the Internal Revenue Code, insurance products are exempt from income taxation on their inside investment build-up (earnings). The economic value of investing through a deferred annuity is to qualify for these tax advantages, including tax deferral of earnings and the ability to switch among different investment accounts inside the annuity without triggering current taxation. However, for persons funding retirement plans (traditional IRAs, rollover IRAs, Roth IRAs, 401(k) plans, and 403(b) arrangements, for example), these tax advantages are unnecessary and redundant. Under the Internal Revenue Code, such retirement plans are already automatically tax deferred (also referred to as "tax-qualified") regardless of the

investments placed in the plan.  But the simple fact is that brokerage firms make more money selling variable annuities than they make selling other products.  So despite the fiduciary relationship and a true conflict of interest, Defendants nevertheless target sales of variable annuities to persons seeking to invest tax-qualified retirement funds.

3.     At least one previous case has successfully challenged variable annuities in tax-qualified plans.  *See generally Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) (Alaimo, J.) (certifying a nationwide class of variable annuity purchasers asserting violations of § 10(b) of the Securities Exchange Act of 1934 and other federal securities statutes).  The *Cooper* case focused on disclosure failures, but this case takes a different approach.  Plaintiff does not challenge the disclosures at issue here, but instead alleges that this practice is a breach of the fiduciary duties that brokerage firms owe to their customers under Georgia law.

4.     The applicable standard was articulated by a unanimous Georgia Supreme Court in *Holmes v. Grubman*, 286 Ga. 636, 643 (2010).  There, in response to a certified question from the Second Circuit of whether "a brokerage firm owe[s] a fiduciary duty to the holder of a non-discretionary account" under Georgia law, the Justices answered in the affirmative, concluding that "[t]he broker will generally have a heightened duty, even to the holder of a non-discretionary account, <u>when</u>

recommending an investment which the holder has previously rejected or as to which the broker has a conflict of interest." 286 Ga. at 643 (emphasis added).

5.     HTK's uniform practice of recommending that its clients use tax-qualified funds to purchase variable annuities constitutes just such a conflict of interest, and the practice cannot pass muster when held up to a fiduciary standard. Simply stated, a fiduciary has a duty to put the interests of his client ahead of his own.  And that is not happening here.  HTK is instead violating its duties under *Holmes,* responding to the conflict by choosing to engage in a form of self-dealing that puts its own interests ahead of its clients' interests.

6.     Brokerage firms sell variable annuities because of their relatively high fees and the large commissions that come with them.  The insurance and surrender fees charged to annuity owners (which are in addition to excessive investment management fees, excessive contract administration fees, and excessive add-on rider fees) yield much greater income to Defendants than would be realized from the sale of straight mutual funds providing the same investment options.  This greater income provides additional profits to Defendants and additional compensation to the selling agents, who receive higher commissions on variable annuity sales than they would on sales of mutual funds.  But the high fees associated with variable annuities can only be justified from the customer's standpoint by their tax-deferred growth, a

benefit that is useless in an IRA like Plaintiff's, which consisted entirely of already tax-qualified funds.

7.     Plaintiff opened a rollover IRA account with HTK in January 2013 by entering into a contract entitled "HTK Account Agreement."  *See* Exhibit A hereto (redacted).  With regard to investment advice that could be compromised by a conflict of interest, the HTK account contract assures customers that "HTK representatives make their recommendations to clients based upon the product suitability to the client and are primarily concerned with recommending products that are consistent with the client's stated investment objectives and needs."  Ex. A at (pdf) p. 13 of 19.

8.     In spite of what the contract says, however, Mr. Cochran was urged and directed by his HTK retirement advisor/fiduciary to invest his retirement funds in a Penn Mutual variable annuity, which he did on February 4, 2013.  Because Mr. Cochran followed that advice, his fiduciary has raked significant unnecessary fees throughout the six-year period since he purchased the annuity: Mortality and Expense ("M/E") charges of 1.45%; Administrative charges of 0.15%; Rider charges of 1.05%; and excessive underlying subaccount expenses ranging from 0.95% to 1.80%.  All of this on an annual basis, and all of it before the prospect of an additional

surrender charge is factored in.[1]  As a result, huge amounts of money that should have been deployed for Mr. Cochran's benefit have instead been siphoned off – by his fiduciary – in the form of inappropriate fees.

9.     And it matters, because these fees make a huge difference in investment returns over the course of many years of saving and investing for retirement.  By retirement age, insurance fees and other detriments of variable annuities cause the loss of a tremendous percentage of a retirement investor's account value, as compared to straight investment products such as mutual funds.  This loss in value is not justified by any of the other supposed "benefits" of the variable annuity vehicle.

10.     Mr. Cochran's experience (in just the last six years) is a testament to that fact. The many layers of fees make a direct comparison a bit cumbersome, but by way of illustration, had Mr. Cochran's retirement funds been invested in equities

---

[1]     A "surrender charge" is a fee charged if the investor sells or withdraws all or a portion of their investment in the variable annuity before a certain time period runs.  According to the SEC, "[t]his charge is used to pay your financial professional a commission for selling the variable annuity to you."  *See* https://www.sec.gov/reportspubs/investor-publications/investorpubsvaranntyhtm.html#vch (last accessed Apr. 28, 2019). Essentially, the advisor/fiduciary is guaranteed a significant payment from selling his client a variable annuity, even if the client realizes the investment was a poor one.  Plaintiff's "surrender period" is 8 years.  There is no benefit to this charge to the client.  It is there to make sure the fiduciary gets his commission.

(as they were in the 401(k) from which these funds were taken) such as a low-cost S&P 500 ETF[2] on February 4, 2013, the initial investment of $365,274.83 would have been worth $712,435.99 as of the end of September, 2018, for a gain of $347,161.16, or 95%. By contrast, because these potential investment gains have instead been absorbed in the form of high and unnecessary fees, Mr. Cochran's September 2018 statement shows that his annuity was worth $498,313.63 if you include the surrender charge, for a gain of $133,038.80, or 36.4%. This back-of-the-envelope calculation shows the amounts in controversy and the magnitude of the harm to Plaintiff and each Class member.

11.    Plaintiff brings this action to recover damages in an amount to be determined at trial on behalf of the following Class: all Georgia residents who were customers of Hornor, Townsend & Kent, LLC and who purchased an individual variable deferred annuity contract or who received a certificate to a group variable deferred annuity contract issued by The Penn Mutual Life Insurance Company, or who made an additional investment through such a contract, from February 1, 2013 through the present (the "Class Period") that was used to fund a contributory

---

[2]    The old Fifth Circuit expressly endorsed the use of stock indices as an appropriate measure of damages to show how an account could have performed in the absence of misconduct. *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318, 328 (5th Cir. 1981).

retirement plan or arrangement qualified for favorable tax treatment pursuant to sections 401, 403, 408, 408A, or 457 of the Internal Revenue Code. Excluded from the Class are Defendants, any officer or director of Defendants or entity in which Defendants had a controlling interest during the Class Period, any member of those persons' immediate families, and the legal affiliates, heirs, controlling persons, agents, successors and predecessors in interest or assigns of any such excluded person or entity.

## <u>JURISDICTION AND VENUE</u>

12. This Court has original jurisdiction over this Class action pursuant to 28 U.S.C. § 1332(d)(2). The claims of the Class members are in excess of $5,000,000 in aggregate, exclusive of interest and costs, and at least one member of the Class is a citizen of a state different from the Defendants. In addition, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, exclusive of interest and costs, and the Plaintiff is a citizen of a state different from the Defendants.

13. This Court has jurisdiction over the Defendants because they transact business in this state, have purposely availed themselves of the laws of this state, and because a substantial part of the events giving rise to Plaintiff's causes of action occurred in this state.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendants maintain offices throughout the state of Georgia, Penn Mutual's registered agent is located in Gwinnett County in this district, and a substantial part of the events giving rise to Plaintiff's causes of action occurred in this district.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails and interstate telephone communications.

## PARTIES AND RELATED NON-PARTIES

16.    Plaintiff Jeffrey A. Cochran is and was at all pertinent times a Georgia resident.  He was sold a Penn Mutual deferred variable annuity based on the recommendation of his HTK advisor, and through his HTK advisor, during the Class Period on February 4, 2013 and suffered damages as a result. Mr. Cochran was formerly employed by J.A. Thomas & Associates, Inc. and had a 401(k) account there until the company was acquired and the plan terminated.  Thereafter, he rolled those 401(k) funds into a rollover IRA, which is also tax-qualified.  Mr. Cochran was introduced to Llewellyn Rowell, who was a registered representative employed by HTK in Marietta, Georgia.  Mr. Rowell convinced Mr. Cochran (and a number of his co-workers at J.A. Thomas who were in the same situation) to invest those

tax-qualified IRA funds in a Penn Mutual deferred variable annuity.  Mr. Cochran's variable annuity contract is still subject to a surrender penalty, which has impeded his ability to exit this product.  Mr. Cochran's relationship with HTK and HTK's conduct and actions associated therewith, is representative for each member of the proposed Class.

17.     Defendant HTK is a brokerage firm and investment adviser firm selling mutual funds, stocks, bonds, variable life insurance products, and annuities.  It is organized as a for-profit Pennsylvania limited liability company with its principal office located at 600 Dresher Road, Horsham, Pennsylvania 19044.  The LLC has only one member, and that is Penn Mutual, so HTK is Penn Mutual's wholly-owned subsidiary, an arrangement that is often referred to in the insurance industry as a "captive" broker-dealer structure.  HTK also serves as principal underwriter of the Penn Mutual annuity contracts.  As detailed herein, HTK sells Penn Mutual annuities to its clients in lieu of other more appropriate investments.

18.     Defendant HTK was at all times relevant hereto the employer of Mr. Rowell and many other individual brokers.

19.     Mr. Rowell and the other brokers were acting within the scope of their employment when they took the actions described herein.

20.     The acts of Mr. Rowell and of each employee, agent, and representative of Defendants are imputed to and binding upon Defendants under the doctrine of *respondeat superior*, principles of agency law, licensing, controlling person and/or as otherwise allowed by law.

21.     Defendant Penn Mutual is an insurance company organized as a for-profit Pennsylvania corporation with its principal office also located at 600 Dresher Road, Horsham, Pennsylvania 19044.  Penn Mutual maintains its Georgia registered agent in Gwinnett County.  Penn Mutual is the parent company to HTK.

22.     In late 2012, Penn Mutual made the strategic decision to focus on the captive broker-dealer model for its variable annuity business.  In November 2012, it cut down on the number of selling agreements with independent broker-dealers, going from 80 to 30.  The plan was to focus on distribution of Penn Mutual's proprietary variable annuity products through HTK, its wholly-owned broker-dealer. The captive structure Penn Mutual chose to embrace is rife with potential for self-dealing and other conflicts of interest.

23.     In addition to HTK, Penn Mutual is the parent company to several other wholly-owned subsidiaries that collect fees and/or generate fees for Penn Mutual through their involvement in the variable annuity business at various levels.

24.     Non-party Penn Series Fund is an open-end management investment company that offers the shares of sub-accounts (funds) for the variable annuity contracts issued by Penn Mutual and The Penn Insurance and Annuity Company ("PIA").   There are approximately 30 funds in the series.   Penn Mutual provides certain administrative and corporate services to the Funds pursuant to the Second Amended and Restated Administrative and Corporate Services Agreement and certain shareholder services pursuant to the Service Agreement. The fees paid to Penn Mutual under each agreement for the provision of such services are based on a predetermined percentage of daily average net assets of each Fund. The services provided by Penn Mutual pursuant to the agreements include, but are not limited to: (a) maintenance of certain records; (b) implementation of certain policies and procedures related to anti-money laundering and customer identification programs; and (c) coordination of the distribution of Fund documents, including the Prospectus, to Fund investors.

25.     Non-party The Penn Insurance and Annuity Company is another subsidiary that offers stand-alone insurance through Penn Mutual's distribution system.   It is unclear whether it participates directly in the annuities sold by Penn Mutual or whether the insurance sold is tangential to those products.

26.     Another Penn Mutual subsidiary, non-party Penn Mutual Asset Management, Inc. (PMAM) provides asset management services to the Penn Series Funds in return for advisory fees.  In most cases, Penn Mutual farms out the actual day-to-day management of the funds to a subadvisor.  In such cases, Penn Mutual still collects an advisory fee and pays a portion to the subadvisor.

## ADDITIONAL ALLEGATIONS

**The Fees**

27.     At all times relevant hereto, HTK was and is in the business of offering investment advice in exchange for fees.  Plaintiff and the Class members entered into a contractual relationship with HTK whereby HTK would advise and assist Plaintiff in making appropriate investments, and Plaintiff would pay a fee for such advice and assistance.  *See* Ex. A, HTK Account Agreement.  Plaintiff and the Class members carried out their end of that arrangement, but HTK did not.  Instead of recommending appropriate investments for Plaintiff's IRA, HTK steered that money to variable annuities that would generate larger fees for HTK and Penn Mutual.

28.     The typical client who is sold an annuity by HTK pays approximately 3.5% per year in fees.  In most cases, 90% or more of these fees are ultimately paid to Penn Mutual and/or Penn Mutual subsidiaries.

29.    For example, Mr. Cochran was sold a Smart Foundation Plus Annuity. The total annual expenses for the annuity are 3.56%.  According to SEC filings,[3] these break down as follows: 1.45% M&E Risk charge; 0.15% Administrative Fee; 0.86% Blended Expense Ratio on the two underlying Penn Series Funds; 1.10% Guarantee Growth and Income Rider.

30.    The annuity has a Mortality and Risk Expense charge of 1.45% annually, which is paid to Penn Mutual.  This fee is primarily used to recoup the amount that Penn Mutual paid to its captive broker-dealer, HTK, as a selling commission for placing the customer in the annuity.

31.    The annuity has an administrative fee of 0.15% annually, which is paid to Penn Mutual.

32.    The underlying investments (the "subaccounts" or "funds") within the Smart Foundation Plus Annuity were selected from a menu of the Penn Series Fund. Each of these subaccounts has an annual expense ratio.  The two funds in Mr. Cochran's annuity are the Flexibly Managed Fund (70% of the initial asset allocation) and the Quality Bond Fund (30% of the asset allocation).  The expense ratio for the Flexibly Managed Fund is 0.94% per year, while the expense ratio for

---

[3]    Certain of these fee percentages set forth in SEC filings differ slightly from those set forth above in paragraph 8, which are taken from Mr. Cochran's account paperwork.

the Quality Bond Fund is 0.68% per year.   The blended expense ratio (weighting the expense ratios according to the 70/30 split) for the subaccounts in the annuity is 0.86% per year.

33.   The expense ratio for each fund consists primarily, but not entirely, of an advisory fee and an administrative fee.  For example, for the Flexibly Managed Fund, the 0.94% expense ratio consists of an advisory fee of 0.70%, which is paid directly to PMAM, and an administrative fee of 0.15% that is paid directly to Penn Mutual.  The remaining 0.09% is a combination of smaller fees such as accounting, custodial, and director's fees.

34.   Though PMAM collects the advisory fee of 0.70% for the Flexibly Managed Fund, it is not involved in the day-to-day management of the fund assets. Penn Mutual farms out the actual management of the fund to T. Rowe Price in exchange for approximately half of the advisory fee (0.35%).  The sub-advisor agreements with T. Rowe Price and other sub-advisors contain language that reads: "To enable Sub-Adviser to fully exercise its discretion, Adviser hereby appoints Sub-Adviser as agent and attorney-in-fact for the Fund with full power and authority to buy, sell and otherwise deal in securities and contracts for the Fund."

35.     Therefore, though PMAM is not actually managing the fund, it is still being paid 0.35% per year for other "services."   From the prospectus of the Penn Series Fund:

> ***Manager of Managers Structure.*** PMAM serves as "manager of managers" for each of the sub-advised Funds. This means that shareholders of each Fund have authorized PMAM, subject to the supervision and approval of the Company's Board of Directors, to hire and terminate unaffiliated sub-advisers without shareholder approval. PMAM remains responsible for the performance of the Funds, as it recommends hiring or replacing sub-advisers to the Company's Board of Directors. Each sub-adviser makes investment decisions for the Fund it manages. PMAM oversees each sub-adviser to monitor compliance with the Fund's investment policies and guidelines and adherence to its investment style.  In its capacity as "manager of managers," PMAM currently has hired sub-advisers to manage the assets of the Flexibly Managed, Large Cap Value, and Small Cap Value Funds. While PMAM currently directly manages the assets of the Money Market, Quality Bond, and Limited Maturity Bond Funds, it may hire sub-advisers to manage the assets of these Funds in the future without shareholder approval.

(Penn Series Fund Form N-1A 2015, p. 154 of 651).

36.     As noted above, PMAM directly manages the Quality Bond Fund, which constitutes 30% of Mr. Cochran's assets within the annuity.   Therefore PMAM keeps the entire advisory fee of approximately 0.44%.

37.     The insurance rider sold within the annuity contract was the Guaranteed Growth and Income Rider based on a single life.   The annual expense for this insurance rider is 1.10%.

16

**The Impact of Fees on Investment Performance**

38.     The SEC writes in an investor bulletin:  "As with anything you buy, there are fees and costs associated with investment products and services. ***These fees may seem small, but over time they can have a major impact on your investment portfolio.***"  (emphasis in original).[4]

39.     Fees have a direct and negative impact on investment returns.  This fact is axiomatic, as investor returns are net of expenses.  However, high fees have greater effects over long investment horizons, which, by definition, is the applicable timeline for tax-qualified retirement accounts.

40.     Researchers have discussed the negative impacts of high fees on performance.  For example, in "Fixing the Drain on Retirement Savings,"[5] authors Erikson and Madland write:

    a.  The corrosive effect of high fees in many retirement accounts forces many Americans to work years longer than necessary or than planned.

---

[4]     Available at https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf

[5]     Available at https://www.americanprogress.org/issues/economy/reports/2014/04/11/87503/fixing-the-drain-on-retirement-savings/.

b. There are two principal problems when it comes to retirement fund fees. First, they are often obscure or misunderstood. Second, they are often simply too high.

c. The impact of these fees is so dramatic that it can strip away 20 percent or more of an employee's retirement savings. In fact, according to simulations in an earlier report, the typical worker is able to achieve sufficient retirement income "69 percent of the time when fees are at 0.5 percent, 57 percent of the time when fees were 1 percent, 45 percent of the time when fees were 1.5 percent, and just 29 percent of the time when fees were 2 percent."

Note that the annual fees charged to Mr. Cochran (even before insurance riders) were 2.46%.

41.    The fees associated with annuities are almost always higher than other investments.  *See, e.g.*, Money Magazine "Why are Annuity Fees so High,"[6] Motley

---

[6]      Available at http://money.com/money/collection-post/2791254/why-are-annuity-fees-so-high/

Fool, "What Costs do Annuities Have?,"[7]   and CNN, "Ultimate Guide to Retirement."[8]

42.    A number of academic papers have looked at the ramifications of high fees in annuities and the advisability of investing in annuities versus alternatives.  In these papers, annuities are typically compared to mutual funds.  Notably, the comparison in these studies is between an annuity (which is tax advantaged) and a *taxable* mutual fund investment.  This case involves investors who purchased annuities in an already tax-advantaged IRA, so the tax advantage of the annuity is superfluous.

43.    In his article "Claim that Variable Annuities Usually Beat Mutual Funds Proves Lame: Critique of Huggard's Analysis in March 1999 Issue of Financial Planning," William Reichenstein compares the performance of four investment options: a) an average-cost annuity, b) a low-cost annuity, c) an actively managed average cost mutual fund and d) a low-cost index mutual fund.  He utilizes a number of assumptions about underlying investment returns, tax rates, and holding

---

[7]     Available at https://www.fool.com/retirement/2018/05/11/what-costs-do-annuities-have.aspx

[8]     Beginning at https://money.cnn.com/retirement/guide/annuities_basics.moneymag/index.htm?iid=EL

periods.  In each of his examples, the low-cost index mutual fund is a superior investment choice to the other three.  Even more dramatic, the out-right loser in all of Reichenstein's examples is the average cost annuity.

44.    In Reichenstein's examples, the average cost annuity has an annual expense ratio of 2.0%.  The Penn Mutual Annuity in this case has an annual expense ratio of 2.46% (even before factoring in the income rider).  If Reichenstein had used the higher 2.46% expense ratio, the annuity would have been an even bigger loser in his analysis.

45.    Additionally, Reichenstein assumes in his analysis that the two mutual fund investment options are in taxable accounts.  Therefore he shows that even where the mutual funds are taxed and the annuity is tax-deferred, the mutual fund investments are superior.  The tax advantage of the annuity does not fully compensate the investor for the drag on returns caused by the much higher expenses in the annuity.

46.    In this case, the alternative investments to the Penn Mutual annuities would be tax-advantaged mutual fund investments in IRAs.  A comparison among the four investment alternatives considered by Reichenstein where the mutual funds are also tax-advantaged would tip the scale dramatically in favor of the mutual funds and further away from the annuities.  The difference in the investment performance

between an "average-cost" annuity and a mutual fund facing the same tax structure would be far greater than identified in Reichenstein's analysis. *See also* "Variable Annuities vs. Mutual Funds: A Monte Carlo Analysis of the Options" by Milevsky and Pangyagometh[9] for treatment of the relative advantages of mutual funds vs. annuities.

47. As an example, consider the circumstances in this case. Mr. Cochran was sold an annuity for approximately $300,000 that was invested approximately 60/40 in stocks and bonds.[10]  Over the last 50 years, the average return of a 60/40 portfolio before expenses has been approximately 8.9%.  If we subtract the annuity expense ratio of 2.46% (without considering the extra cost of the income rider), the net return to the annuity would be 6.44%.  Assume as a comparison, an investment in a similarly allocated indexed mutual fund with an expense ratio of 0.10%.  After 20 years, the $300,000 annuity would have grown to $1,045,000, while the index fund investment would have grown to $1,620,000.  Over that 20-year period, the

---

[9]      Available at https://pdfs.semanticscholar.org/035e/afd4f084114a645ec60cea9c5bdcd039e1f4.pdf

[10]      As noted above, Mr. Cochran's asset allocation was 70% in the Flexibly Managed Fund and 30% in the Quality Bond Fund.  However, the Flexibly Managed Fund contains some bonds, which brings the figure to approximately 60/40.

discrepancy in fees results in the mutual fund portfolio being worth $575,000 more than the annuity.

48.    If we look instead at a fund or annuity investment with an expense ratio of 0.50%, the results are still dramatic.  The lower cost annuity outperforms the higher cost annuity by $460,000 at the 20-year point.  The graph below shows the performance            differences            at            various            time            horizons:



**Compensation for Selling Annuities**

49.     Given the vast superiority of mutual funds vs. annuities within the same tax-qualified account structure, there must be some other reason that brokers, like those at HTK, would sell an inferior product to their clients.  The reason is simple: brokers are paid more for selling annuities than other products.[11]  Therein lies the conflict that is at the heart of this case.

50.     The Penn Mutual Variable Annuity Prospectus describes the surrender charge as follows: "If you wish to withdraw more than the Free Withdrawal Amount (see Section 4.2 "Surrender-Charge Free Withdrawals") or decide to surrender your Contract during the Surrender Charge Period, you may be assessed a Surrender Charge. This charge is used to pay our sales expenses. Sales expenses that are not covered by the Surrender Charge are paid from the surplus of the Company, which may include proceeds from the Mortality and Expense Risk Charge."

51.     The combination of the surrender charge and the Mortality and Risk charge are used to compensate Penn Mutual for the commissions paid to HTK

---

[11]     For a discussion of the commissions paid to brokers for annuity sales, *see, e.g.*, "The Levels of Commission Agents Earn on Annuities," available at https://www.thebalance.com/what-levels-of-commission-do-agents-earn-on-annuities-146003

brokers.  In the first full two years after the contract is sold, the surrender charge is 8%.

52.     The commission for an annuity sale is likely 2 to 3 times higher than the commission a broker would earn selling mutual funds.  *See, e.g.*, "Mutual Fund Share Classes and Broker Incentives" by Edward O'Neal.

**The Utmost Good Faith**

53.     A special relationship of trust and confidence exists between a brokerage firm and its customer. As noted above, Georgia courts have expressly characterized that relationship as fiduciary in nature, as has the Eleventh Circuit. *See, e.g.*, *Holmes v. Grubman*, 286 Ga. 636, 643 (2010) (applying O.C.G.A. § 23-2-58's "utmost good faith" standard); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor.").  *See also* Loss, Securities Regulation 1508 (2nd Ed. 1961) ("There is in effect and in law a fiduciary relationship"); 5C Jacobs, Litigation and Practice Under Rule 10b-5 §210.03 (1994) ("Brokers owe a fiduciary duty to their customers"); Restatement (Second) of Agency § 13 (1959) ("A broker-dealer acting as an agent for his customer is a fiduciary with respect to matters within the scope of his agency").

54.     Black's Law Dictionary (6th Edition) defines a fiduciary duty as "A duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person.  It is the highest standard of duty implied by law (e.g., trustee, guardian)." (Emphasis added.)

55.     As commentators have noted, fiduciaries are strictly prohibited from engaging in many activities that might be permissible in arm's-length dealings:

> A fiduciary relationship is a relationship of trust and confidence in which one of the parties (the fiduciary) owes to the other party (the beneficiary) a duty of utmost loyalty and good faith. The fiduciary duty is even more stringent than the duty owed in confidential relations. The fiduciary duty is owed by an agent to his principal and by an employee to his employer. It is also owed by a trustee to a beneficiary of a trust, by an officer or director of a corporation to the corporation and its shareholders, a partner to the partnership, by joint venturers, and by a lawyer to his clients.  A fiduciary may not deal at arm's length. [. . . ] A fiduciary must deal fairly and in good faith with the beneficiary. As Judge (later Justice) Cardozo said "[m]any forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee [fiduciary] is held to something stricter than the morals of the market place. *Moreover, a fiduciary must act solely in the interest of the beneficiary, not in his or her own interest or in the interest of a third party. The fiduciary's loyalty must be undivided, and his or her actions must be devoted exclusively to represent and promote the interests of the beneficiary.*

Robert S. Adler and Richard A. Mann, *Good Faith: A New Look at an Old Doctrine*, 28 Akron Law Rev. 31, 34-35 (1994) (citations omitted; emphasis added).  Georgia courts agree:

> [W]henever a fiduciary or confidential relation exists between the parties to a deed, . . . the law implies a condition of superiority held by one of the parties over the other, so that in every transaction between them, by which the superior party obtains a possible benefit, equity raises a presumption of undue influence, and casts upon that party the burden of proof to show affirmatively his compliance with equitable requisites and of entire fairness on his part and freedom of the other from undue influence.

*Mathis v. Hammond*, 268 Ga. 158, 161 (1997) (quoting *Trustees of Jesse Parker Williams Hosp. v. Nisbet*, 191 Ga. 821, 841 (1941)); O.C.G.A. § 23-2-58 ("Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.").

56.    A fiduciary relationship existed between HTK and the Class members. HTK knew that Plaintiff and the Class members trusted HTK to recommend appropriate investments and to put its customers' interests ahead of its own. Throughout the course of their relationship, HTK sought to engender, and did in fact engender, Plaintiff and the Class members' trust and confidence in its ability and willingness properly to advance all of their investment objectives and needs. At all times, HTK possessed superior skill and experience in the investment arena.

57.     As noted above, the HTK account contract assures customers that HTK's investment advice will not be compromised by a conflict of interest.  Ex. A at (pdf) p. 13 of 19 ("HTK representatives make their recommendations to clients based upon the product suitability to the client and are primarily concerned with recommending products that are consistent with the client's stated investment objectives and needs.").  On that same page (and at numerous other points) within the HTK account contract, customers are directed to HTK's website "[f]or detailed and important information."   Once there, the website further provides that "Our representatives [ ] may recommend a product from any HTK approved product sponsor, with their recommendation based upon the client's stated investment objectives and needs."

58.     HTK's website (last visited April 24, 2019) also contains the following statements about what clients can expect from their relationship with HTK:

**A Foundation of Trust**
At HTK, we hold ourselves out to the highest standards of care. Our financial advisors work directly with you to understand your unique goals and objectives and provide valuable guidance to navigate today's complex economic environment.


* * *

We partner with our representatives to help them put clients on the right financial path, to manage risk, ensure financial protection, and grow their wealth.

\* \* \*

Our national network of financial professionals is dedicated to helping you meet your financial planning, protection, accumulation and distribution needs with confidence. We also offer the unique opportunity to help meet your goals through Hornor, Townsend & Kent, LLC (HTK), our wholly owned broker/dealer subsidiary, Registered Investment Advisor, Member FINRA / SIPC.

We believe that there's no single factor more important in life than the value of strong personal relationships. Based on this belief, we partner with our financial professionals to deliver the care and personal attention, trusted insights and relevant solutions to protect clients.

In addition to assuring customers that they can rely on HTK to provide investment advice untainted by conflict, statements like these demonstrate that HTK has acknowledged and embraced its status as a fiduciary to its customers.

59.     Because of the fiduciary relationship with HTK, the Class members reasonably relied to their detriment on HTK's superior skill and experience in handling their accounts.

60.     Under the terms of the HTK account contract and Georgia law, HTK owed to Plaintiff and the Class members a duty to recommend appropriate investments for funds they entrusted to HTK.  Further, HTK owed this fiduciary duty to protect and further Class members' interests over and above HTK's desire to generate fees and promote its own interests and those of its corporate parent, Penn Mutual.

61.    The retirement investment market in the United States has undergone a revolution in recent decades. Instead of guaranteed lifetime pension benefits, contributory retirement plans (like IRAs, 401(k)s, and 403(b)s) now predominate. The goal, of course, is to maximize asset accumulation for retirement.  Retirement plans are the largest assets owned by many households, yet most individuals are not well-equipped to deal with the complex considerations involved in effectively managing these assets.

62.    The sales transactions at issue in this complaint are often the single most financially consequential decision many people will make in their lifetimes. Defendants have willfully capitalized on investors' lack of experience in order to profit from selling deferred annuities to persons who do not benefit from them.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class: all Georgia residents who were customers of Hornor, Townsend & Kent, LLC and who purchased an individual variable deferred annuity contract or who received a certificate to a group variable deferred annuity contract issued by The Penn Mutual Life Insurance Company, or who made an additional investment through such a contract, from February 1, 2013 through the present (the "Class Period") that was used to fund a contributory

retirement plan or arrangement qualified for favorable tax treatment pursuant to sections 401, 403, 408, 408A, or 457 of the Internal Revenue Code.  Excluded from the Class are Defendants, any officer or director of Defendants or entity in which Defendants had a controlling interest during the Class Period, any member of those persons' immediate families, and the legal affiliates, heirs, controlling persons, agents, successors and predecessors in interest or assigns of any such excluded person or entity.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Defendants  and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

65.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of Georgia law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants have favored their own interests over those of Plaintiff and the Class members by recommending that customers' tax-qualified accounts be used to fund high-fee variable annuities;

(b)     whether Defendants' conduct is a breach of the fiduciary duties required by Georgia law; and

(c)     whether the members of the Class have sustained damages and the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, because joinder of all members is impracticable.  There will be no difficulty in the management of this action as a class action.

## COUNT I
## <u>BREACH OF FIDUCIARY DUTIES</u>
### (AGAINST DEFENDANT HTK)

69.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

70.     By virtue of HTK's Account Agreement (Exhibit A hereto) with clients like Plaintiff, and under Georgia law, the members of the Class and HTK had a fiduciary relationship, and HTK owed fiduciary duties to each of the Class members.

71.     HTK was required to act with due regard for Class members' interests and to subordinate its own selfish interests to those of Class members where their interests conflicted.

72.     Instead, HTK has chosen to serve its own interests through a form of self-dealing.  HTK has violated its fiduciary duties to the Class members by providing investment advice that was not in customers' best interests in an effort to steer Class members' money into variable annuities that would pay higher fees to HTK and its parent, Penn Mutual.

73.     In so doing, HTK failed to act with due regard for the Class members' interests consistent with its fiduciary duties.

74.     Plaintiff and the Class members have suffered damages as a direct result of HTK's breach of these fiduciary duties.

75.     Plaintiff and the Class members are entitled to all possible relief, including an award for the full amount of their damages resulting from HTK's breach of fiduciary duties, plus interest, attorneys' fees, and costs.

## COUNT II
## PROCURING (OR AIDING AND ABETTING) THE BREACH OF FIDUCIARY DUTIES
(AGAINST DEFENDANT PENN MUTUAL)

76.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

77.     At all relevant times, Penn Mutual was aware that HTK owed fiduciary duties to Plaintiff and the Class members.

78.     Because HTK is Penn Mutual's wholly-owned subsidiary, Penn Mutual was in a position to (and did) advise, counsel, persuade, and command HTK to breach its duties to Plaintiff and the Class members.

79.     Through improper action and wrongful conduct, Penn Mutual acted to procure (and did procure) the breach of the fiduciary duties HTK owed to Plaintiff and the Class members.  Penn Mutual induced HTK to favor its own interests and those of Penn Mutual over the interests of Plaintiff and the Class members by providing investment advice that was not in customers' best interests in an effort to

steer Class members' money into variable annuities that would pay higher fees to HTK and Penn Mutual.

80.     In procuring the breach of HTK's duties, Penn Mutual acted purposely and with malice and the intent to benefit itself and HTK at the expense of Plaintiff and the Class members.

81.     Plaintiff and the Class members have suffered damages as a direct result of Penn Mutual's procuring the breach of HTK's fiduciary duties.

## COUNT III
## ATTORNEYS' FEES UNDER O.C.G.A. § 13-6-11
### (AGAINST ALL DEFENDANTS)

82.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

83.     Defendants have caused Plaintiff and the Class members unnecessary trouble and expense in their attempt to recover the amounts due them.  As such, Class members are entitled to recovery of attorneys' fees pursuant to O.C.G.A. §13-6-11 and other applicable law.

## COUNT IV
## PUNITIVE DAMAGES
### (AGAINST ALL DEFENDANTS)

84.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

85.     In *Miley v. Oppenheimer & Co., Inc.,* the old Fifth Circuit included the

following passage in a discussion of punitive damages:

> Most courts in the past have seen fit, when they find the
> broker-dealer's hand in the till, to simply request the
> removal of the offending appendage. And when the till is
> empty, and the broker-dealer's fingerprints are all that
> remain where the money once lay, all the courts do is to
> require the crook to replace the booty. If ever there was a
> situation where crime pays it is in such circumstances;
> heads the dishonest broker-dealer wins and tails everyone
> breaks even. No wonder one commentator saw fit to term
> the average recovery in trading cases as creating for the
> broker-dealer a "low risk larceny."
>
> . . . [T]he only way of deterring such conduct in the future
> is to take the profit away from the wrongdoers and slap on
> an additional amount as punitive damages: an award equal
> to treble damages would be fair, reasonable, and well
> within the public interest.

637 F.2d 318, 332 (5th Cir. 1981).  *See also Interfinancial Midtown, Inc. v. Choate

Constr. Co.*, 343 Ga. App. 793, 800 (2017) ("To say the only remedy of the

creditor is in equity to set aside the conveyance would be to urge the debtor to

convey his property away to hinder [ ] creditors, for if he should get caught at it, no

matter [ ] how odious the injury, the worst that could happen would be the setting

aside of the conveyance . . .") (quoting *Kesler v. Veal*, 182 Ga. App. 444, 451

(1987)).

86.    This is not the first time HTK has run into trouble regarding its variable annuity sales practices.  At least two regulatory actions have been filed against HTK that resulted in six-figure fines.  *See, e.g.,* FINRA Letter of Acceptance, Waiver and Consent No. 2015043387001 (Nov. 14, 2017) (resulting in sanctions and a fine of $275,000); *see also* NASD Letter of Acceptance, Waiver and Consent No. C9A050032 (July 6, 2005) (resulting in sanctions and a fine of $325,000).

87.    In addition to the damages that naturally and normally flow from their claims, Plaintiff and the Class members are entitled to recover a sum in order to deter Defendants and others from similar conduct in the future, in an amount to be determined by the enlightened conscience of the jury.

88.    Defendants' actions have been willful, intentional, wanton, and have been done with such entire want of care as to raise the presumption of conscious indifference to consequences.

89.    Because the acts alleged herein were willful, intentional, and done with a specific intent to harm, there is no limitation on the amount of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class

defined herein;

(b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, plus a "benefit of the bargain" calculation of additional damages, plus interest as allowed by law;

(c)      Awarding Plaintiff and the other members of the Class the expenses of litigation, including attorneys' fees, pursuant to O.C.G.A. § 13-6-11 or otherwise as allowed by law;

(d)      Awarding Plaintiff punitive damages in an amount sufficient to deter Defendants and others from committing similar actions in the future; and

(e)      Awarding such other and further relief as the Court deems appropriate.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted this 29th day of April, 2019.

*/s/ David A. Bain*
David A. Bain
GA Bar No. 032449
Law Offices of David A. Bain, LLC
1230 Peachtree Street, NE
Suite 1050
Atlanta, GA  30309
Tel: (404) 724-9990
Fax: (404) 724-9986
Email: dbain@bain-law.com

James M. Evangelista
David J. Worley
Kristi Stahnke McGregor
EVANGELISTA WORLEY LLC
8100A Roswell Road Suite 100
Atlanta, Georgia 30350
Tel: (404) 205-8400
Fax: (404) 205-8395
 jim@ewlawllc.com
david@ewlawllc.com
kristi@ewlawllc.com

Michael L. McGlamry
GA Bar No. 492515
Jay F. Hirsch
GA Bar No. 357185
Kimberly J. Johnson
GA Bar No. 687678
POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, GA  30326
Ph:  404-523-7706
Fx:  404-524-1648
efile@pmkm.com

Wade H. Tomlinson, III
GA Bar No. 714605
Michael Morrill
GA Bar No. 545410
POPE McGLAMRY, P.C.
1200 6th Avenue
Columbus, GA  31901
Ph:  706-324-0050
Fx:  706-327-1536
efile@pmkm.com

Roy E. Barnes
J. Cameron Tribble
BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, GA 30060
Tel. 770-227-6375
roy@barneslawgroup.com
ctribble@barneslawgroup.com

*Counsel for Plaintiff and the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I have electronically filed the foregoing **PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will automatically send an e-mail notification of such filing to all attorneys of record.

Dated this 29th day of April, 2019.

> */s/ David A. Bain*
> David A. Bain
> Georgia Bar No. 032449
> LAW OFFICES OF DAVID A. BAIN, LLC
> 1230 Peachtree Street, NE
> Suite 1050
> Atlanta, GA 30309
> (404) 724-9990
> (404) 724-9986 (facsimile)
> dbain@bain-law.com